UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| FRANK A. MARION & CLOVIS H., MARION, )<br>　　　　Plaintiffs, )<br>)<br>vs. )<br>)<br>MARICOPA COUNTY ADULT, )<br>PROBATION DEPARTMENT, *et. al.*, )<br>)<br>　　　　Defendants. )<br>　　　　　　　　　　　　　　　　　) | 2:09-cv-00178 JWS<br><br>ORDER AND OPINION<br><br>[Re: Motion at Docket 110] |

## I.  MOTION PRESENTED

At docket 110, defendants Michael Goss, Athena Dekorski, Kurt Margosian, Sean Steill, Jerry Waller, and their "doe" spouses ("defendants") move pursuant to Federal Rule 56 for summary judgment on all claims. Plaintiffs Frank and Clovis Marion ("plaintiffs"), through the personal representatives of their estates, oppose the motion at docket 117. Defendants' reply is at docket 119. Oral argument was heard on January 20, 2011.

## II.  BACKGROUND

This suit arises out of the search of a bedroom at the plaintiffs' home. John Marion ("Marion") is the plaintiffs' son. Prior to his 2005 conviction for a sex offense,

Marion lived with plaintiffs at 4707 W. Harmont Drive in Glendale, Arizona ("Harmont residence"). Plaintiffs were elderly and in poor health. Marion was their caretaker. After serving his one-year jail sentence, Marion was placed on lifetime supervised probation. His request to move back in with his parents was denied due to the proximity of a high school. Marion subsequently found an apartment in Sun City, Arizona. The Maricopa County Adult Probation Department ("APD") at some point allowed him to resume his capacity as a caretaker to his parents. Marion was permitted to be at the Harmont residence from 4:00 p.m. until 6:00 a.m. To assist with daytime care, Marion and his brother, Robert Marion, hired Patricia Perez-Reyes. A third caretaker, Jacques Bowie, was hired at Perez-Reyes' recommendation and subsequently terminated.

In January 2008, Kirk Margosian, Marion's probation officer, received a phone call from Bowie. Bowie indicated that Marion was spending time at the Harmont residence outside his APD-approved work shift and using a bedroom there. Bowie alleged that Marion had engaged in potentially abusive behavior towards his parents, consumed alcohol, and stole his parents' medication. Margosian contacted his supervisors, Athena DeKarske and Vince DeArmond, who authorized a warrantless probation search of the bedroom. On January 29, 2008, Margosian called the Harmont residence to confirm Marion's presence. He assembled a search team that comprised APD Surveillance Officers Sean Steill, Julie Anderson, and Jerry Waller and two Glendale police officers, Reginald Relf and Robert Sterrette.

The details of the search are in dispute. Defendants allege that Clovis Marion consented to the bedroom search and that the search was limited to that room. Plaintiffs maintain that there was no such consent, that Clovis Marion was told to "stay

out of the way," and that the search encompassed several rooms.[1]  Frank Marion was bedridden and unable to meaningfully intervene.  In the bedroom–which defendants allege was John's and plaintiffs allege was used by all caretakers–the APD officers found and seized four video tapes, a pellet rifle and pellets, a metal club, three unopened wine coolers, one open wine cooler bottle, a rifle scope, a hatchet, and ten bottles of medication prescribed to Frank or Clovis Marion.  After the search of the Harmont bedroom, the search team went to John Marion's Sun City residence, where it found and seized other evidence that Marion had violated his probation.  Marion was held in custody until a May 6, 2008 hearing at which point the court found he had violated a condition of his probation.  Marion was released and ordered to continue on lifetime probation.

   Frank and Clovis Marion filed a complaint against APD, the Maricopa County Superior Court, the City of Glendale, the Glendale Police Department, Michael Goss (Deputy Chief Probation Officer for Maricopa County), Dekorski, Margosian, Steil, Waller, Relf, Sterrette, and the State of Arizona.  Plaintiffs asserted four claims for relief.  Plaintiffs' first claim for relief is pled pursuant to 42 U.S.C. § 1983 and based on alleged violations of the Fourth Amendment.  Plaintiffs' second claim for relief asserts various common law torts.  Plaintiffs' third claim for relief is pled against APD and the Glendale Police Department only.  It alleges unconstitutional policies, customs, and failure to train.  Plaintiffs' fourth claim for relief is also made pursuant to § 1983 and is based on

---

[1]Doc. 20 ¶ 28.

alleged violations of the Privileges and Immunities Clause of Article IV, and the Equal Protection and Due Process Clauses of the Fourteenth Amendment.

On August 26, 2009, the court dismissed all claims against APD and the Superior Court, all § 1983 claims against the individual defendants in their official capacities, and one § 1983 claim against Goss.[2]  Frank Marion died on May 12, 2009. Clovis Marion died on November 25, 2009.  The court substituted their respective estates as plaintiffs.[3]

### III.  STANDARD OF REVIEW

Summary judgment is appropriate where "there is no genuine issue as to any material fact and . . . the movant is entitled to judgment as a matter of law."[4]  The materiality requirement ensures that "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."[5]  Ultimately, "summary judgment will not lie if the . . . evidence is such that a reasonable jury could return a verdict for the nonmoving party."[6]  In resolving a motion for summary judgment, a court must view the evidence in the light most favorable to the

---

[2] Doc. 52.

[3] Doc. 88; doc. 91.

[4] Fed. R. Civ. P. 56(c)(2).

[5] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[6] *Id.*

alleged violations of the Privileges and Immunities Clause of Article IV, and the Equal Protection and Due Process Clauses of the Fourteenth Amendment.

On August 26, 2009, the court dismissed all claims against APD and the Superior Court, all § 1983 claims against the individual defendants in their official capacities, and one § 1983 claim against Goss.[2]  Frank Marion died on May 12, 2009. Clovis Marion died on November 25, 2009.  The court substituted their respective estates as plaintiffs.[3]

### III.  STANDARD OF REVIEW

Summary judgment is appropriate where "there is no genuine issue as to any material fact and . . . the movant is entitled to judgment as a matter of law."[4]  The materiality requirement ensures that "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."[5]  Ultimately, "summary judgment will not lie if the . . . evidence is such that a reasonable jury could return a verdict for the nonmoving party."[6]  In resolving a motion for summary judgment, a court must view the evidence in the light most favorable to the

---

[2] Doc. 52.

[3] Doc. 88; doc. 91.

[4] Fed. R. Civ. P. 56(c)(2).

[5] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[6] *Id.*

non-moving party.[7]  The reviewing court may not weigh evidence or assess the credibility of witnesses.[8]  The burden of persuasion is on the moving party.[9]

## IV.  DISCUSSION

### A. Search & Seizure

Defendants maintain that because the testimony of Clovis or Frank Marion was not preserved, plaintiffs are unable to prove factual allegations relating to the details of the search.  Therefore, defendants' argument goes, summary judgment is appropriate with respect to plaintiffs' First Claim for Relief.  If defendants' warrantless search of the Harmont residence was unlawful, however, the intricacies of the search are immaterial to the existence of a violation.

**1. Material Issues of Fact Exist as to Clovis Marion's Consent**

As defendants concede in their reply brief, various affidavits submitted by plaintiffs create a genuine dispute as to the material fact of whether Clovis Marion consented to the search of the bedroom.[10]  Consequently, Clovis Marion's consent cannot provide a basis for summary judgment in defendants' favor.

---

[7]*Lopez v. Smith*, 203 F.3d 1122 (9th Cir. 2000).

[8]*Dominguez-Curry v. Nevada Transp. Dept.*, 424 F.3d 1027, 1036 (9th Cir. 2005).

[9]*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

[10]Doc. 119 at 6–7.

**2. Material Issues of Fact Exist as to Whether APD Had Probable Cause to Believe that John Marion Lived at the Harmont Drive Residence**

"[W]arrantless searches of probationers' *residences* are permissible under the Fourth Amendment when they are authorized by a condition of probation and supported by reasonable suspicion of criminal activity."[11] Defendants argue that the search of the bedroom in Clovis and Frank Marion's home was valid under the Fourth Amendment because it was supported by a reasonable suspicion that John Marion had violated the conditions of his probation. Defendants have confused the applicable precedent and consequently failed to make an adequate showing with respect to critical facts.

In *United States v. Davis*,[12] the Ninth Circuit held "that police must have reasonable suspicion, that an item to be searched is owned, controlled, or possessed by [the] probationer, in order for the item to fall within the permissible bounds of a probation search." That case involved a search of a safe that belonged to the defendant but was located within a probationer's home.[13] The facts of *Davis* are the reciprocal of those at bar–the present case involves a probationer with ostensible control of a bedroom in a non-probationer's home.

Defendants argue that the *Davis* standard "extends to rooms over which [a] probationer has common authority with fellow occupants."[14] In support of their

---

[11] *United States v. Mayer*, 560 F.3d 948, 956 (9th Cir. 2009) (emphasis added); *see also United States v. Knights*, 534 U.S. 112, 121–22 (2001).

[12] 932 F.2d 752, 758 (9th Cir. 1991).

[13] *Id.* at 755.

[14] Doc. 110 at 12.

argument, defendants cite *People v. Pleasant*,[15] a decision from the California Court of Appeal. "While the federal courts may consider state precedent for its persuasive value, the validity of a search conducted by state law enforcement officers is ultimately a question of federal law."[16] Moreover, like *Davis*, *Pleasant* is distinguishable because it involved a non-probationer child who resided with his probationer-mother–not the inverse situation which is ostensibly at issue.[17] For that reason, its persuasiveness is diminished. Ultimately, even if ownership of the residence were immaterial, defendants have not made an adequate showing that John Marion lived with his parents at the time of the search.

In *Motley v. Parks*,[18] the Ninth Circuit discussed the effective scope of parolee consent. "Generally, a condition of parole that permits warrantless searches provides officers with the limited authority to enter and search a house where the parolee resides, even if others also reside there."[19] However, "[n]othing in the law justifies the entry into and search of a third person's house to search for the parolee."[20] Such a condition therefore, "indicates only the parolee's acquiescence to a warrantless search of *his own residence*."[21] The Ninth Circuit held that "before conducting a warrantless

---

[15] 19 Cal. Rptr. 3d 796 (Cal. Ct. App. 2004).

[16] *Davis*, 932 F.2d at 758.

[17] *Pleasant*, 19 Cal. Rptr. 3d at 797.

[18] 432 F.3d 1072 (9th Cir. 2005).

[19] *Id.* at 1079.

[20] *Id.*

[21] *Id.* (emphasis added).

search pursuant to a parolee's parole condition, law enforcement officers must have probable cause to believe the parolee is a resident of the house to be searched."[22]

The Ninth Circuit has "consistently recognized that there is no 'constitutional difference between probation and parole for purposes of the [F]ourth [A]mendment.'"[23] The court will apply the *Motley* standard to the facts of the present case, which involves a probationer and not a parolee.[24] Accordingly, the issue is whether defendants had probable cause to believe that John Marion was a resident of Clovis and Frank Marion's house.

Probable cause is a "practical, nontechnical conception."[25] The Ninth Circuit "has applied a relatively stringent standard in determining what constitutes probable cause that a residence belongs to a person on supervised release."[26] "It is insufficient to show that the [probationer] may have spent the night there occasionally. Instead, the facts known to the officers at the time of the search must have been sufficient to support a belief, in 'a man of reasonable caution'" that the probationer lived at the residence in question.[27]

---

[22] *Id.* at 1080.

[23] *Id.* at 1083 n.9; *see also United States v. Davis*, 932 F.2d 752, 758 (9th Cir. 1991) ("We do not believe the distinction between the status of parolee and that of a probationer is constitutionally significant for purposes of evaluating the scope of a search.").

[24] *But see Samson v. United States*, 547 U.S. 843, 850 (2006) (On the "continuum of state-imposed punishments . . . parolees have fewer expectations of privacy than probationers, because parole is more akin to imprisonment than probation.") (internal quotations omitted).

[25] *Brinegar v. United States*, 338 U.S. 160, 176 (1949).

[26] *United States v. Howard*, 447 F.3d 1257, 1262 (9th Cir. 2006).

[27] *Id.*

In his deposition, Margosian indicated that APD "didn't know how long [Marion] was staying [at his parents' home]."[28] He "suspected that [Marion] was staying there more than 50 percent of the time."[29] His suspicion was based on the fact that Steil had visited Marion's Sun City residence and that Marion "was not at home when he should have been at home."[30] Marion's absence on "one or two" occasions could not have given rise to probable cause that Marion resided at his parents' home.[31]

Margosian stated that APD "had information from Jock [sic] and Patricia . . . that John was staying for extended periods rather than going back to his primary residence."[32] Prior to his conviction and probation, John Marion lived at his parents' address.[33] Defendants have presented evidence that Margosian was aware of that fact.[34] Upon his release from jail, John formally requested to live there again. But this history is counterbalanced by John's reported residence in Sun City, where probation officers found him present on all but one or two occasions.[35] Furthermore, Margosian's

---

[28] Doc. 117-6 at 20.

[29] *Id.*

[30] *Id.*

[31] *Cf. United States v. Watts*, 67 F.3d 790, 795 (9th Cir. 1995) (finding probable cause existed where "[i]n weekly visits to [Watts's reported address, Watts's parole officer] had located Watts there only once in fourteen months").

[32] Doc. 117-6 at 22.

[33] Doc. 111-1 at 30.

[34] *Id.* at 3.

[35] Doc. 117-6 at 20.

deposition insinuates that when Marion was not "at home" he was also "not at work, at the [Harmont] residence."[36]

Where the Ninth Circuit has found probable cause to believe that a probationer resided at an unreported address, it has done so on compelling facts.[37] Defendants have not presented facts adequate to support a belief by a person of reasonable caution that Marion actually was living at the Harmont residence.

**3. Material Issues of Fact Exist as to Whether John Marion Had Common Authority Over the Harmont Drive Residence**

Defendants argue that John Marion's common authority over a bedroom in his parents' house rendered his probation consent effective. The Supreme Court has made clear that "the consent of one who possesses common authority over premises or effects is valid as against the absent, nonconsenting person with whom that authority is shared."[38]

> Common authority is . . . not to be implied from the mere property interest a third party has in the property. . . . [It] rests rather on mutual use of property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched.[39]

---

[36] *Id.*

[37] *See Howard*, 447 F.3d at 1262–1266 (canvassing Ninth Circuit case law to "demonstrate[] just how stringent this [probable cause] standard is").

[38] *United States v. Matlock*, 415 U.S. 164, 170 (1974).

[39] *Id.* at 171 n.7.

Defendants maintain that plaintiffs "cannot dispute . . . that John Marion had frequent and regular use of, and at least joint control over, a bedroom at his parents' house."[40]  Defendants state that "[i]t is undisputed that John Marion was spending the night at his parents' house on a frequent and regular basis, that Frank and Clovis Marion provided their son a bedroom for his use, and that the search was limited to that room."[41]  Plaintiffs respond that John Marion "occasionally stayed at [his] parents' house overnight, but only in [his] capacity as their caregiver, and only when absolutely necessary."[42]  Plaintiffs characterize the bedroom as a "nurse's room, used by all of the various caregivers" and "accessible to anyone."[43]  The court is obligated to view the evidence in the light most favorable to the plaintiffs and is not permitted to weigh evidence or credibility.  Accordingly, the evidence supporting the parties' differing characterizations of the bedroom creates a genuine dispute as to issues of material fact that would tend to prove common authority.

Defendants cite *State v. Walker*[44] for the proposition that *Matlock* common authority "has been extended to probation consent searches [insofar as] Arizona law recognizes that persons who share living quarters with a probationer cannot reasonably expect privacy in areas of a residence that they share with a probationer."[45]  *Walker*, like

---

[40]Doc. 110 at 3.

[41]Doc. 110 at 13.

[42]Doc. 117-7 at 4.

[43]*Id.* at 6, 7; doc. 117-2 at 6.

[44]158 P.3d 220 (Ariz. Ct. App. 2007)

[45]Doc. 110.

*Pleasant* above, involved a non-probationer in residence with a probationer.[46] Furthermore, the validity of the search at issue is a matter of federal law.[47] In any case, defendants' argument ultimately fails on separate grounds because there are outstanding issues of material fact as to whether John Marion was living with his parents at the time of the search.

The question of whether Marion actually had common authority over the bedroom differs from the question of whether probable cause existed to believe he lived in the Harmont residence. The latter involves information available to Margosian and the other probation officers. The former involves the actual circumstances of his presence at his parents' home. Defendants cite APD's approval of Marion's return to his caretaker role and Margosian's knowledge that the "overnight arrangement meant John Marion would once again have a bedroom for his use at his parents' residence."[48] Defendants also cite plaintiffs' admission that "John Marion had use of a bedroom" at plaintiffs' residence.[49] Defendants conflate use of a bedroom with residence. Marion was permitted to assist his parents at the Harmont residence from 4:00 p.m. until 6:00 a.m. The availability of a bedroom in that situation is neither out of the ordinary nor indicative of common authority, particularly in light of plaintiffs' assertions that the bedroom was available to all caretakers.[50]

---

[46] *See Walker*, 158 P.3d at 221–22.

[47] *Davis*, 932 F.2d at 758.

[48] Doc. 110 at 13; doc. 111-1 at 5.

[49] Doc. 110 at 13; doc. 111-3 at 5.

[50] *See, e.g.*, doc. 117-2 at 6.

Finally, defendants cite Sixth Circuit precedent to the effect that an officer's reasonable belief of authority to consent satisfies the Fourth Amendment.[51] Defendants' argument fails for two reasons. First, defendants have not demonstrated any authority extending that principle from affirmative, voluntary consent to probation consent. Second, outstanding issues of material fact bear on the question of whether APD or Margosian's belief that Marion had authority–if held–was reasonable. As discussed above, regardless of Marion's history at the Harmont residence, at the time the search took place, his presence there was officially restricted. Because Marion was only allowed to be at his parents' house between 4 p.m. and 6 a.m., and because issues of fact remain as to whether he was spending additional, unauthorized time there, it is premature to deem reasonable any belief that Marion had authority to consent to a search of the bedroom.

## B. Lack of Plaintiffs' Testimony & Proof of Damages

### 1. First Claim for Relief - 42 U.S.C. § 1983, Fourth Amendment

Defendants argue that because the testimony of Frank and Clovis Marion was not preserved, plaintiffs cannot prove damages stemming from any Fourth Amendment violation.[52] However, nominal damages are available for constitutional violations.[53] Additionally, plaintiffs argue that they are entitled to punitive damages.[54] The Supreme Court has held "that a jury may be permitted to assess punitive damages in an action

---

[51] Doc. 119 at 3 (citing *United States v. Jones*, 335 F.3d 527, 531–32 (6th Cir. 2003)).

[52] Doc. 110 at 6–8.

[53] *Schneider v. County of San Diego*, 285 F.3d 784, 794–95 (9th Cir. 2002).

[54] Doc. 117 at 5–6.

under § 1983 when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others."[55] It is not necessary that Frank or Clovis Marion's testimony have been preserved for a jury to conclude that entry into their home involved reckless indifference to their Fourth Amendment rights. That inference may be drawn from independent facts. Summary judgment on the issue of damages is inappropriate.

### 2. Second Claim for Relief - Common Law Torts

Defendants also argue that all of the state law tort claims in plaintiffs' second claim for relief fail because neither Frank nor Clovis Marion's testimony was preserved. Plaintiffs have asserted claims for trespass to land, false imprisonment, intentional and negligent infliction of emotional distress, conversion, and trespass to chattels. Only elements dependent upon the subjective knowledge or experience of the plaintiffs will fail for lack of their testimony. Whether the torts alleged require injury to Frank and Clovis is telling.

Trespass to land does not require injury.[56] Accordingly, neither Frank nor Clovis Marion's testimony is necessary to make out a claim for trespass to land. False imprisonment requires either "conscious[ness] of the confinement" or harm.[57] Although plaintiffs are unable to show that plaintiffs suffered any harm resulting from any confinement, other facts may support consciousness of confinement. Conversion is

---

[55] *Smith v. Wade*, 461 U.S. 30, 56 (1983).

[56] Restatement (Second) of Torts § 158 (1965) ("One who intentionally and without a consensual . . . privilege . . . enters land in possession of another . . . is liable as a trespasser . . . *irrespective of whether harm is thereby caused*.") (emphasis added).

[57] *Id.* § 35(1)(c).

"[a]n intentional exercise of dominion or control over a chattel which so seriously interferes with the right of another to control it that the actor may justly be required to pay the other the full value of the chattel."[58] Trespass to chattels "may be committed by intentionally . . . dispossessing another of the chattel."[59] Neither Frank nor Clovis Marion's testimony is necessary to support a claim on their behalf, for conversion or trespass to chattels, provided the claim is based on dispossession.

Intentional infliction of emotional distress, on the other hand, requires a showing of "severe emotional distress."[60] Even if plaintiffs were able to demonstrate that defendants' conduct was "extreme" and "outrageous," they are unable to prove severe emotional distress.[61] Plaintiffs' negligent infliction of emotional distress claim also fails. That tort requires, *inter alia*, a showing that the plaintiff "suffer[ed] mental anguish manifested as physical injury."[62] Plaintiffs have adduced no evidence that they suffered anguish which manifested as physical injury, nor will they be able to.

---

[58]*Universal Marketing & Entertainment v. Bank One of Ariz.*, 53 P.3d 191, 193 (Ariz. Ct. App. 2002) (quoting Restatement (Second) of Torts § 222A(1) (1965)).

[59]Restatement (Second) of Torts § 217(a).

[60]*Ford v. Revlon, Inc.*, 734 P.2d 580, 585 (1987).

[61]*Id.*

[62]*Pierce v. Casas Adobe Baptist Church*, 782 P.2d 1162, 1165 (1989).

### 3. Third Claim for Relief - 42 U.S.C. § 1983, Unconstitutional Policies

Defendants argue that plaintiffs' "unconstitutional policies" claim fails for want of proof. That claim was only pled against APD and the Glendale Police Department. All claims against APD were dismissed in a previous order.[63] The Glendale Police Department did not join defendants' present motion. The court need not address plaintiffs' third claim in this order.

### 4. Fourth Claim for Relief - 42 U.S.C. § 1983, Deliberate Indifference to Medical Needs

Defendants argue that the allegations supporting plaintiffs' fourth claim for relief are unprovable. The claim is based on confiscation of plaintiffs' medication. There is no dispute that the medication seized was prescribed to John Marion's parents. Although the viability of plaintiffs' fourth claim for relief is suspect, it does not fail for want of proof of the confiscation.

## C. Immunity

### 1. Plaintiff's Federal Claims

Defendants argue that they are entitled to qualified immunity on plaintiffs' federal claims.[64] In *Saucier v. Katz*,[65] the Supreme Court mandated a two-part test of qualified immunity. First, the facts, as shown by the plaintiff, must establish violation of a constitutional right. Second, the constitutional right in question must have been clearly

---

[63] Doc. 52.

[64] Doc. 110 at 14.

[65] 533 U.S. 194 (2001).

established.[66]  In other words, "[q]ualified immunity is applicable unless the official's conduct violated a clearly established constitutional right."[67]  In *Pearson v. Callahan*, the Supreme Court overruled *Saucier*, clarifying that its "protocol should not be regarded as mandatory" and leaving to the court's "sound discretion . . . which of the two prongs . . . [to] address[] first in light of the circumstances in the particular case at hand."[68]

Here, the constitutional rights at stake were Frank and Clovis Marion's rights to be free from an unreasonable search.  Viewing the facts in the light most favorable to the plaintiffs, defendants' conduct would have violated those rights because defendants did not have a warrant.  The question is whether those rights were clearly established given their son's probation.

While this is a close question, the *Saucier* inquiry "turns on the *objective* legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken."[69]  The preceding sections adequately canvass legal rules that were clearly established at the time of the search.  Among them, an officer relying on probationer consent must have probable cause to believe that the probationer resides at the residence searched.[70]  It has not been demonstrated that this rule was followed.

---

[66]*Id.* at 201.

[67]*Pearson v. Callahan*, 129 S.Ct. 808, 816 (2009).

[68]*Id.* at 818.

[69]*Id.* at 822 (internal quotations omitted) (emphasis added).

[70]*Motley*, 432 F.3d at 1080.

Defendants maintain that "a reasonable probation officer in . . . Margosian's position would not have been on clear notice that he was violating . . . [p]laintiffs' rights by conducting what he believed to be a valid probation consent search limited to a bedroom that he reasonably believed to be used, and at least jointly controlled, by the probationer."[71] The same problems affecting the substantive discussion of defendants' common authority rationale are present here. Marion's primary residence and the temporal restrictions on his presence at his parents' home again call the reasonableness of Margosian's belief into question. Objectively, on plaintiffs' version of the facts, it would have been clear to an officer in Margosian's position that the warrantless search of the Harmont residence violated the Fourth Amendment rights of the plaintiffs in light of the legal rules in place at the time the search was conducted.

### 2. Plaintiffs' State Law Claims

#### a. Absolute Immunity

Defendants argue that they are entitled to absolute immunity with respect to plaintiffs' common law tort claims.[72] The Arizona Supreme Court has indicated that "a probation officer is entitled to absolute protection from suit for actions which are necessary to carry out and enforce the conditions of probation imposed by the court."[73] Defendants offer only the conclusory statement that "[t]he probation consent search at issue here was clearly an action necessary to carry out and enforce the Conditions of

---

[71]Doc. 110 at 15.

[72]*Id.* at 16.

[73]*Acevedo v. Pima County Adult Probation Dept.*, 690 P.2d 38, 41 (1984).

Probation imposed by the court on John Marion."[74]  This is not the forum to relitigate the substance of Marion's Disposition Hearing.  However, it appears that there was ample contraband seized at Marion's primary residence–contraband that was undisputedly his–such that a search of the Harmont residence was not necessary to enforce the conditions of Marion's probation.  By contrast, on the record available to the court, ownership of items seized at the Harmont residence is or was disputed.[75]  Defendants have not demonstrated that a search of the Harmont residence was necessary to enforce the conditions of Marion's probation.

### b. Qualified Immunity

Defendants argue that they are entitled to qualified immunity, pursuant to A.R.S. § 12-820.02(A)(3),  with respect to plaintiffs' common law tort claims.  That section provides that "[u]nless a public employee . . . intended to cause injury or was grossly negligent, neither a public entity nor a public employee is liable for . . . [a]n injury resulting from the probation . . . of a prisoner . . . [or] from the terms and conditions of the prisoner's . . . probation."[76]  The court is highly skeptical that the drafters of § 12-820.02 intended to immunize probation officers from injuries arising from allegedly unlawful probation searches.  Paragraph (3) immunizes public entities and employees from liability for the "*granting* of probation" and, it follows, from liability in *setting* terms and conditions.[77]  The drafters of the statute were concerned with curbing state and

---

[74]Doc. 110 at 16.

[75]Doc. 117-7 at 6–7.

[76]A.R.S. § 12-820.02(A)(3).

[77]*See Evenstad v. State*, 875 P.2d 811, 815 (Ariz. 1993) (emphasis added).

state employee liability stemming not from their own actions, but from the actions of prisoners and probationers.

## V.  CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment at docket 110 is **GRANTED** in part and **DENIED** in part as follows:

1) It is **GRANTED** as to plaintiffs' claims for intentional infliction of emotional distress and negligent infliction of emotional distress.

2) It is **DENIED** with respect to plaintiffs' first and fourth claims for relief and with respect to plaintiffs' claims for trespass to land, false imprisonment, conversion, and trespass to chattels.  The court does not reach the question of whether the Glendale Police Department could be liable on the third claim for relief.

3) Plaintiffs' request for costs and fees is **DENIED**.

DATED this 26th day of January 2011.

>                             /s/
>              JOHN W. SEDWICK
>     UNITED STATES DISTRICT JUDGE